

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
JUL 24 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 08-170 (JR) |
| v. | : | |
| | : | VIOLATIONS: 18 U.S.C. § 2423(b), |
| | : | (Traveling in Interstate Commerce for |
| ADAM BRYANT, | : | purpose of engaging in Sexual Contact with |
| | : | a Minor); 22 D.C. :Code § 3010(b) (Enticing |
| | : | a Child) |

### REVISED STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Adam Bryant, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offenses; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty.

1. On March 25, 2008, members of the Innocent Images Task Force and an undercover Fairfax County police officer (hereinafter referred to as "UC"), posted a message in the Craigslist.com erotica section. The message read: "Family Fun for discreet clientele only. Serious inquiries only. For more information, hit me back for more details. In town until Thursday, March 27." Less than ten minutes later, an individual later identified as the defendant, using the screen name "Let's Play", e-mailed a reply to the UC, saying "Like what I hear, so please let me see you," and proposing that they "get together for a mutually beneficial time." He identified himself as a 29 year-old consultant residing in the District of Columbia.

2. The UC replied that his 13-year old step-daughter "is willing to work for daddy."

He told the defendant that he would appreciate a donation, and told the defendant to "[c]all and let me know what your interest is . . . if you are interested," and "[i]f serious." The defendant requested to see a picture before making the phone call. The UC sent the defendant a picture of a man and a girl, which he represented as a picture of himself and his step-daughter.

3. Upon receiving the picture, the defendant replied, "Perfect...is she there with you...I will want to talk to her directly." The UC did not immediately reply, so he followed up, "well...is she there for me to talk to???" The UC replied that she was available, and asked whether the defendant wanted to call them, or if they should call the defendant instead. The defendant said that he would call "in a couple of minutes," and requested that the UC "have her pick up the phone."

4. The tape recording of the telephone conversation between the purported child and the defendant revealed that during the course of the conversation, the "child" told the defendant that she was "thirteen" years old. The defendant confirmed to her that he knows "that you want to help out your daddy...". The defendant asked the purported child if she had ever had sex before, and asked her about the pictures that her "stepfather" had sent to him. The defendant then talked to the UC, and explained, in detail, what he wanted the girl to do: meet in a coffee shop, have the girl wear a short skirt, slide the skirt up high so that the defendant can make sure that she is not wearing any panties.

5. The defendant then sent the UC an e-mail, thanking him for the phone call, reassuring the UC that he is "very legit," and making a proposal for the following night. Defendant proposed that the UC buy the stepdaughter a revealing skirt, "ass high," for which he would cover the cost; that they meet the following night, March 26, at the Green Turtle; that he pay the UC $100 up front, "play with" the stepdaughter for 30 minutes, pay $300 more to the

UC, and take the stepdaughter back to the UC's hotel for an additional hour of sexual activity.

6. Before the UC replied, the defendant modified his proposal, noting that he would "really love to [see the stepdaughter] and one of her young girlfriends for a night." He offered to pick them up and send them back 24 hours later. He again reassured the UC that he is legit, explaining that "I was a geek when I was her age and didn't get any...now I am rich and want to buy what I missed."

7. The next day, the UC informed the defendant, in a taped conversation, that another person called and wanted to come to the hotel that night, and as a result, rejected the defendant in favor of the other person. Without any hesitation, defendant offered the UC $1000.00, stating, "I'll give you a grand." The defendant then tried to convince the UC that he was "legit". However, the UC made it clear that he was going to "go with" the other person.

8. Sometime later, the UC then informed the defendant via e-mail that he could "really use a grand..." and proposed that the defendant meet him at Pentagon City mall if he is still interested. The defendant said he is "definitely interested," asking "did you get her a very revealing skirt?" The UC replied that for $1,000, he would let him have her for the night, and he asked the defendant "what your interests are."

9. The defendant agreed to pay $1000 in exchange for sex with the fictitious child, and specified what he wanted to do with the 13 year-old girl. The defendant listed:

*Anal(bareback)*

*Swallowing*

*Sex(condoms)*

*Eating her out*

*And playing with her in public*

*Her fingering herself*

*Also, I would love to try and get as many fingers into her as possible that is*

*optional depending on her experience and I would like her shaved smooth.*

During another point in the e-mail conversation, the defendant informed the undercover that the girl "will be spanked", but assured, "I will be gentle".

10. Defendant agreed to meet the undercover and his "step-daughter" at Champs Restaurant in Arlington, Virginia on that evening, March 26, 2008. The defendant instructed the UC that he wanted the girl to wear the "shortest shorts she has, lowest cut shirt, no bra, no panties." Defendant told the undercover that once at the restaurant, he wanted the girl "sitting at the table with her shorts unbuttoned and her hand in her pants fingering herself...", so that he could be sure that "there is no way this is a set up."

11. That night, the defendant arrived at the agreed upon restaurant. The "step-daughter" called the defendant on his mobile phone, and asked the defendant where her father was, telling him that she had to use the bathroom. The defendant told the "step-daughter" that she was supposed to be inside the bar with no panties on and fondling herself. After that conversation, the defendant was arrested. A subsequent search revealed that the defendant was in possession of $400 in cash, a personal check in the amount of $600.00, a video camera, and a camera cell phone.

JULIEANNE HIMELSTEIN
Assistant United States Attorney

STEVEN MCCOOL, ESQ.
Attorney for Defendant

ADAM BRYANT
Defendant

7/24/08
Date

7/24/2008
Date

**DEFENDANT'S ACKNOWLEDGMENT**

I have read this Statement of the Offense and have discussed it with my attorney, Steven McCool, Esq. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 7/24/2008

ADAM BRYANT
Defendant

**ATTORNEY'S ACKNOWLEDGMENT**

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 7/24/08

STEVEN MCCOOL, ESQ.
Attorney for Defendant Adam Bryant